UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


TRACY DIETERICH                              )
                                             )
V.                                           )          NO. 2:10-CV-36
                                             )
THE HARTFORD LIFE AND ACCIDENT               )
INSURANCE CO.                                )


## REPORT AND RECOMMENDATION

Plaintiff filed this action against the defendant to recover long term disability

insurance benefits.  For the most part, the suit is governed by the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et. seq.*  The defendant's

counter-claim, however, which seeks to recover from the plaintiff "overpayments" of benefits

paid to her, is *extra*-ERISA, a circumstance which implicates the provisions of F.R.Civ.P.

56 to the extent that matters outside the Administrative Record ("AR.") may be considered.

The parties' respective dispositive motions, (Docs. 20 and 22), have been referred to the

magistrate judge for a report and recommendation pursuant to the standing order of this

Court and 28 U.S.C. § 636.[1]

The plaintiff, Ms. Dieterich, ("Dieterich"), was a Sales Representative for Takeda

Pharmaceuticals North America, Inc. ("Takeda").  Takeda sponsored and maintained a

---

[1]Order, Doc. 25.

Welfare Benefit Plan ("Plan") for its employees.   Part of that Plan involved Takeda's purchase of a group long term disability insurance policy from the Hartford Life and Accident Insurance Co. ("Hartford").  Hartford was the Plan administrator.

Takeda's Plan vested Hartford with "full discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy."[2] After Hartford denied her application for long term disability benefits, Ms. Dieterich filed this suit.  Since Hartford was granted discretion to determine eligibility for benefits, this court is required to utilize the "highly deferential arbitrary and capricious" standard of reviewing the Plan Administrator's denial of benefits.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).  The court may not substitute its judgment for that of the Administrator.  *Reed v. Wal-Mart Stores, Inc.,* 197 F.Supp.2d 883, 887 (E.D. Mich. 2002).  The court must consider only the facts known to the plan administrator at the time it made its decision.  *Yeager*, 88 F.3d at 381.  The eligibility determination of a plan administrator is not arbitrary and capricious if that decision is "rational in light of the plan's provisions."  *Miller v. Metro. Life Ins. Co.*, 925 F.2d 975, 984 (6th Cir. 1991).

Hartford is not only the Plan Administrator, it also is the source of funds to be used to pay any benefits under the policy.  As a result of Hartford's dual capacity as Plan Administrator and payor of benefits, it has an obvious conflict of interest which must be

---

[2]AR. pp. 1031, 1042

taken into account, along with the evidence considered by the Administrator, in determining whether it acted arbitrarily and capriciously in denying Ms. Dieterich's claim. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). In something of a preemptive strike, Hartford filed the affidavit of James Early,[3] an "Appeals Specialist" for Hartford. In paragraph 9, Mr. Early asserts that Hartford thoroughly considered all documents and information submitted by Ms. Dieterich in support of her claim, and that Hartford based its decision "solely upon the merit of [her] claim." In paragraph 10, he maintains that Hartford's decision was not motivated by self-interest, or by Hartford's desire to avoid paying benefits, but rather was based solely on the provisions of the Plan and all relevant information within the Administrative Record. In paragraphs 16-24, he describes the separate "Appeals Unit" for Hartford which, so he claims, makes independent assessments of previous claim denials.

Ms. Dieterich insists that the court should not consider Early's affidavit in light of the principle enunciated in *Yeager*, 88 F.3d 376 (6th Cir. 1996), *viz.*, that the court may not consider any evidence outside the record considered by the Plan Administrator.

Hartford points to the unreported case of *Klein v. Central States*, 2009 WL 2877933 (6th Cir. 2009), in which the Court of Appeals held that such affidavits may be considered when a claim of bias is raised. *Klein* is persuasive, and Mr. Early's affidavit will be considered.[4]

---

[3]Doc. 23-1.

[4]Normally, pretrial depositions in an ERISA case are not allowed. But affidavits such as the one filed by Mr. Early are a relatively new phenomenon. Had Ms. Dieterich asked to take the deposition of Early, or any other person relevant to the facts asserted in Early's affidavit, the

The policy issued to Takeda provides a covered employee with a monthly benefit if she becomes disabled while insured under the Plan; remains disabled throughout the Elimination Period, and then beyond; and was under the Regular Care of a Physician during the Elimination Period.[5]

The policy provided disability benefits for two distinct categories of disability, one of which was a disability from performing the "Essential Duties" of the employee's specific occupation ("Your Occupation," or "Own Occupation"), and the other of which was a disability from performing the Essential Duties of "Any Occupation."[6]  Benefits for Ms. Dieterich's inability to perform the Essential Duties of her Own Occupation were payable for a maximum of thirty-six months.[7]  Thereafter, she was required to be disabled from performing the Essential Duties of *any* occupation in order to continue receiving benefits.[8]

"Your Occupation" was defined as Ms. Dieterich's occupation as it is recognized in the general workplace."[9]

"Any Occupation" is defined as "an occupation for which [she is] qualified by

court would have allowed those depositions to take place.  Hartford cannot ask that this court accept to be true matters outside the Administrative Record while at the same time shielding itself from any inquiry by the other side.   In other words, Hartford cannot have it both ways. But Ms. Dieterich did not seek to take any such depositions.

[5]AR. p. 1033.

[6]AR. p. 1043.

[7]AR. p. 1043.

[8]AR. p. 1043.

[9]AR. p. 1045.

education, training or experience . . . ." [10]

"Essential Duty" is declared to be a duty that "is substantial, not incidental; is fundamental or inherent to the occupation; and can not be reasonably omitted or changed."[11]

Ms. Dieterich's monthly benefits were calculated by multiplying her Monthly Income Loss by the Benefit Percentage; then comparing that result with the Maximum Benefit provided by the Policy; and then deducting from the lesser of those two amounts "Other Income Benefits."[12] "Other Income Benefits" are defined as "the amount of any benefit for loss of income, provided to you or to your family, as a result of the period of Disability for which you are claiming benefits under [Hartford's] plan . . . [and which] . . . includes any such benefits for which you or your family are eligible or that are paid to you, to your family or to a third party on your behalf pursuant to . . . disability benefits under . . . the United States Social Security Act . . . ."[13] In other words, Ms. Dieterich's Monthly Benefit under the Policy had to be reduced by the amount of any Social Security Disability Benefits she received.

The Plan required Ms. Dieterich to apply for Social Security Disability Benefits if she made a claim under the Plan, or while she was receiving disability benefits under the Plan.[14]

---

[10]AR. p. 1042.

[11]AR. p. 1043.

[12]AR. p. 1035.

[13]AR. p. 1044.

[14]AR. p. 1041.

If Ms. Dieterich received Social Security Disability Benefits that resulted in an "overpayment" of benefits – recalling that "Other Income Benefits" is a factor in the determination of the monthly benefit due an employee, – then the Plan provides that Hartford has "the right to recover from [her] any amount that is an overpayment of benefits . . . [and Ms. Dieterich] . . . must refund to [Hartford] the overpaid amount."[15]

Initially, Hartford approved Ms. Dieterich's claim for disability benefits. She executed a Reimbursement Agreement in which she asked Hartford to pay her a monthly benefit with no reduction for any Other Income Benefits she might receive, acknowledging that she understood that such unreduced payments could result in an overpayment to her which she would be required to refund to Hartford in a lump sum.[16]

According to the uncontradicted affidavit of Mr. Early, the Appeals Specialist for Hartford, Ms. Dieterich was awarded Social Security Disability Benefits, and her minor son received "dependent" Social Security Disability Benefits, both of which resulted in an overpayment of benefits by Hartford to Ms. Dieterich.[17] Early's Affidavit further recites that, although Ms. Dieterich repaid a portion of the "overpaid benefits," she still owes Hartford $23,464.39, which she has declined to pay.[18]

---

[15]AR. p. 1042.

[16]AR. p. 790.

[17]Early Affidavit, Doc. 23-1, ¶¶ 12, 13. With respect to Hartford's counterclaim to recover an overpayment of benefits, Rule 56 controls, not ERISA.

[18]*Id.*, ¶ 14.

***HARTFORD'S COUNTERCLAIM TO RECOVER OVERPAYMENT OF BENEFITS***

Hartford's counterclaim to recover the alleged overpayment of benefits is independent of the issue regarding Ms. Dieterich's entitlement to long term disability benefits from Hartford. Regardless of whether she receives those benefits or not, the question of the overpayment will persist.

It is undisputed that Ms. Dieterich received an award of Social Security disability benefits, and it is also undisputed that her minor son received an award of dependent disability benefits.

Hartford insists that the child's benefits are included within "Other Income Benefits" for purposes of calculating Ms. Dieterich's monthly disability benefit from Hartford, whereas Ms. Dieterich argues that she receives the dependent's benefits solely as his "representative payee," and that she is charged by the Social Security Administration to use those monies for her son's needs. In other words, she argues that the dependent's Social Security disability benefits are her son's, not hers, and therefore are not "Other Income Benefits" for purposes of calculating her long term disability benefits under Hartford's policy.

Again, the Policy defines Other Income Benefits as "The amount of any benefit for loss of income, provided *to you or to your family,* as a result of the period of Disability for which you are claiming benefits under [Hartford's] Plan. This includes any such benefits for which *you or your family* are eligible or that are paid to you, *to your family*, or to a third party

on your behalf . . . [under the Social Security Act]."[19]  The words, "to your family," would be rendered meaningless if the Social Security award to Ms. Dieterich's son are excluded in the calculation of Other Income Benefits.

The relevant language in *Hampton v. Dana Corporation*, 2005 WL 2615997 (6th Cir. 2005), is essentially the same as the language in this case.  In *Hampton*, the Plan contained a provision that monthly benefits would be reduced by "the amount of any Primary and Family Social Security Benefits for which the Employee is . . . eligible."  *Id*., at **1.  The defendant reduced the plaintiff's benefits not only by the Social Security Disability Benefits the plaintiff received, but also by the benefits which his children received. *Id*., **1.  Plaintiff argued to the Court of Appeals that the defendant's "interpretation [was] unreasonable because social security benefits that are payable to an employee's children are not social security benefits 'for which the Employee is . . . eligible.'"[20] The Sixth Circuit Panel held that it was reasonable for the defendant to interpret "Primary and Family Social Security benefits for which the Employee is . . . eligible" as including Social Security benefits awarded to the employee's child.  *Id*., at **3.

For whatever it is worth, the United States District Court for the Eastern District of Ohio, *Pennell v. The Hartford Life & Accident Ins. Co.*, 2010 WL 330259 (N.D. Ohio 2010), when considering the identical situation and the identical language in a Hartford policy, held that the language was neither unconscionable nor contrary to public policy.  *Id*. at *4.  The

---

[19]AR. p. 1044, italics supplied.

[20] *Id*., at **2.

district judge aptly noted that the ERISA Plan, when all was said and done, was simply a contract, "and there is nothing in the Social Security Act to suggest that an employer cannot bargain to allow for an adjustment based upon Social Security benefits awarded." *Id.*

The conclusion is inescapable that Hartford is entitled to a judgment on its counterclaim in the amount of $23,464.39.

## MS. DIETERICH'S CLAIM FOR LONG TERM DISABILITY BENEFITS

Although Ms. Dieterich's initial brief first suggested that this court should review the Administrator's decision *de novo*,[21] there is no doubt, and in reality neither is there any dispute, that the standard of review by this court is the "arbitrary and capricious" standard in light of the Plan's grant of discretion to Hartford to construe and interpret the terms and provisions of the Policy.[22]

Plaintiff's duties as a "Sales Representative" for Takeda included contacting physicians by telephone and in person to promote Takeda's products; distributing product samples and marketing literature to healthcare providers; calling physicians' offices and other healthcare organizations to establish contact opportunities; contacting physicians for their opinions and suggestions regarding Takeda products; insuring that pharmacies adequately stocked Takeda's products; and generally providing feedback to Takeda's managers regarding customer requests, response to promotions, etc.[23] The job required an ability to

---

[21]Doc. 21, p. 1.

[22]*See*, plaintiff's reply, Doc. 27, p. 1.

[23]AR. p. 802.

travel by plane or to drive an automobile to meet clients, and she was required to travel frequently; she was required to have sufficient manual dexterity to operate office equipment; she was required to sit for long periods of time, and to carry, handle, and reach for objects.[24] As one would expect, as a Sales Representative, she was required to carry with her samples for employers products, a laptop computer, promotional items, and of course the ubiquitous cell phone. Occasionally, she would be required to carry up to 35 pounds.[25]

She last worked on April 7, 2006.[26] On April 21, 2006, she filed her claim with Hartford for disability benefits on the basis of transverse myelitis and inflammatory polyarthritis.[27] Transverse myelitis is an inflammation of the spinal cord which damages or destroys myelin, the fatty insulating substance that covers nerve cells' fibers, that results in scarring which interrupts communications between the nerves and the spinal cord and the rest of the body. Symptoms can include muscle weakness or paralysis of the arms and legs; pain; loss of sensation in the toes and feet; and loss of bladder and bowel function.[28]

By letter dated October 12, 2006, Hartford advised Ms. Dieterich that it had concluded that she was disabled from performing one or more of the Essential Duties of "Your Occupation," and therefore her claim for long term disability benefits was approved as of

---

[24]AR. p. 803.

[25]AR. p. 481.

[26]AR. p. 801.

[27]AR. p. 841.

[28]AR. p. 57.

October 14, 2006.[29] To state the obvious, the medical evidence submitted at that time was adequate in Hartford's corporate opinion to sustain Ms. Dieterich's claim of disability.

In October 2007, Hartford requested records from Dr. Kind, a chiropractor; Dr. Williams, a specialist in pain medicine; and Dr. McDavid, Ms. Dieterich's family physician. McDavid's notes regarding his examination of Ms. Dieterich in August 2007 reflected that she had no back or joint pain; no decreased range of motion, muscle cramps, or weakness; and no swelling of the extremities.[30] Nevertheless, McDavid's "assessment" of Ms. Dieterich's condition was fibromyocitis, inflammatory arthropathies, major depression, and dysthemic disorder.[31]

Dr. Williams submitted his notes for Ms. Dieterich's office visit in September 2007. Those notes stated that his subjective findings were "marked improvement" as the result of an earlier cervical epidural steroid injection; that she had intermittent tingling, but no discomfort or weakness; and that she had chronic complaints of muscle tenderness which she related to her fibromyalgia, but otherwise Ms. Dieterich's believed that she had returned to "baseline" (whatever that was), and was quite pleased.[32] His objective findings reflected that Ms. Dieterich walked with an "unencumbered gait," and appeared to be comfortable. Her upper and lower extremity sensory and motor functions were intact, but he did note diffuse

---

[29]AR. p. 48.

[30]AR. p. 688.

[31]AR. p. 689.

[32]AR. p. 698.

tenderness.  His assessment was a herniated disk at C-5/6; left C-6 riticulitis; degenerative disk disease of the cervical spine at C-4/5 and C-5/6; a history of transverse of myelitis; and a history of fibromyalgia.[33]

In response to Hartford's request for updated records, Dr. Kind (the chiropractor) wrote a letter to Hartford's Claims Examiner in December 2007.  In that letter Dr. Kind said that he had been treating Ms. Dieterich two to three times per week since the first of August; that her complaints remained the same on a daily basis; that the severity of her reported symptoms varied greatly from day to day, although her symptoms never disappeared, which he stated was "typical of autoimmune complaints and transverse myelitis;" that she complained of neck pain, headaches, upper back and shoulder pain, pain in the low back and in both feet.  Dr. Kind reported that objectively he noted joint sensitive point tenderness; spasm of the paravertebral muscles and most major muscle groups. He also noted a loss of range of motion in the spine and positive orthopedic tests, depending upon the day of the examination.  He advised that his treatment goal was to relieve Ms. Dieterich's discomfort until her medical doctor was able to find a more long term solution.[34]

A week before Dr. Kind mailed his letter to Hartford's Claims Examiner, another employee of Hartford decided that an investigator should be hired to conduct surveillance of Ms. Dieterich, the justification being that her "limitations appear severe when compared

---

[33] *Id.*

[34] Ar. p. 670.

to the medical findings."[35]  That surveillance was conducted on January 3, 2008, and, so Hartford argues in its brief, the video recording "demonstrated functional capacity that was inconsistent with her reported restrictions and limitations . . . ."[36]  The investigator followed Ms. Dieterich, both in his vehicle and on foot, as she ran various errands in Johnson City for nearly eight hours during that day.  Her travels started at approximately 8:00 in the morning when she drove to Northside Hospital, where she remained for slightly less than 2 hours.  She then drove to a CVS Pharmacy, in which she shopped for more than an hour.  She then drove to her chiropractor's office, where she stayed for approximately 12 minutes, after which she went to another store in which she shopped for more than an hour.  She then went to the Johnson City Mall where she shopped for an hour and a half.  She then went to a Big Lots Store, in which she perused the merchandise.

The videotape is lengthy, and this magistrate judge viewed it in its mind-numbing entirety.  In the recording, she is observed to bend repeatedly at the waist to view merchandise on a lower shelf; she squats down, and then stands; she drops to her knees, then squats down on her toes; and on it goes in like fashion.  Suffice it to say that the video recording reveals a woman who is able to move about in a normal fashion, without any limitations.

On March 20, 2008, the investigator met with Ms. Dieterich and showed her the video recording.  The investigator reported to Hartford that Ms. Dieterich acknowledged that "on

---

[35]AR. p. 153.

[36]Doc. 23, p. 6.

a good day" she could perform those activities documented on the recording, but that the recording did not represent her *normal* level of functioning.[37] Ms. Dieterich argues in her brief that her activities on January 3, 2008, indeed were an aberration and an uncharacteristically good day for which she paid dearly the following day, as evidenced by her failure to leave her house at all.[38]

In 2008, Dr. Kind advised Hartford that Ms. Dieterich's primary care physician had diagnosed her condition as acute transverse myelitis; polyarthralgia/polyarthritis; polymyositis; fibromyalgia; T-11 disk bulge; and cervical disk degeneration. He pointed out that each of these conditions, singly, could cause acute pain and distress, and the purpose of his treatments was to relieve her pain. He noted that short term relief was successful on almost every visit, but there had been almost no long-lasting or permanent improvement in her "activities of daily living." Although he had discussed the possibility of discontinuing her treatment, he reported that she preferred to remain under his chiropractic care in order to reduce her dependence on pain medications.[39] On September 30, 2008, another Medical Case Manager sent letters to Dr. McDavid, Dr. Williams, Dr. Kimbrough, and Dr. Kind in which he requested these providers to determine and report to Hartford Ms. Dieterich's "current maximal functional level."[40] The Case Manager wrote in these letters that he

---

[37]AR. p. 159.

[38]Doc. 24, p. 7.

[39]AR. p. 542.

[40]AR. p. 27, *et. seq.*

believed that Ms. Dieterich had "greater functional capabilities than she has previously reported to [Hartford]," and it is undeniable that his opinion in that regard was based upon the surveillance recording and the Investigator's subsequent interview with Ms. Dieterich.[41] The Case Manager also stated in his letter to these physicians that it was Hartford's conclusion that Ms. Dieterich was capable of functioning at a "Light level" during a forty-hour week, which would consist of standing, walking, and/or sitting unlimited throughout the day; consistent with full use of her upper extremities; lifting/carrying to ten pounds on a frequent basis, and up to twenty pounds occasionally; and if her job required sitting for most of the time, she should be afforded the opportunity to stand up and move about as needed.[42] This, of course, is essentially the description of "light work" under the Social Security Regulations.[43] The Case Manager stated that he, i.e., Hartford, did not believe any of the medical evidence submitted to Hartford indicated that Ms. Dieterich was unable to perform light work. Nevertheless, he asked that these physicians advise him of their opinions regarding Ms. Dieterich's functional capabilities. Specifically, he asked that each of them answer, either "yes" or "no," whether he believed that Ms. Dieterich had the functional ability to perform the physical demands of "Light work." If the physician responded with "no," then the Case Manager asked them to justify any additional restrictions that physician

---

[41] *Id.*

[42] *Id.*

[43] 20 C.F.R. § 404.1567(b). Someone at Hartford, at some unspecified time, procured an "Occupational Analysis" which concluded that Ms. Dieterich's specific occupation as a Sales Representative should be classified as "Light." *See*, AR. p. 480.

believed to be appropriate, as well as explaining what the Case Manager believed was the inconsistent behavior on the video recording.[44]

Dr. Kimbrough responded to the Case Manager by marking "yes," cryptically writing thereafter "Light duty = frequent sitting."[45] Dr. Kind responded that Ms. Dieterich had reported to him that she did periodically go out of the house to run errands, but that doing so incapacitated her for days thereafter. Dr. Kind, in something of a "turnabout is fair play," asked the Case Manager if he had any data regarding any other days the patient was observed before and after her day of visits to the hospital, pharmacy, chiropractor, and retail stores, other than that single video recording, stating that such data would be critical to his answer to Hartford's inquiry.[46] Hartford did not respond to Dr. Kind's request.

Dr. David answered Hartford's inquiry by checking "no," explaining his response by saying, "Due to the reports from her neurologist specialist, I will concur with him that she can not maintain any modest level of functional capacity. She may be able to run errands, but only for short times."[47]

Hartford then retained the services of Dr. Howard Choi, a physician whom Hartford described as an "independent physician consultant," who is board certified in Physical Medicine and Rehabilitation. Dr. Choi reviewed the medical records then in Hartford's

---

[44]AR. p. 28.

[45]AR. p. 404-5.

[46]AR. p. 427.

[47]AR. p. 409.

possession, and the surveillance video. Dr. Choi, without the benefit of examining the plaintiff or personally talking with any of her treating physicians, concluded that "The records and video surveillance . . . do not support any residual, ongoing functional impairments of a physical nature." In short, he concluded that there was no objective evidence to support any functional limitations or impairments. From that, he concluded that she had no limitations of any kind.[48]

Within two weeks of Dr. Choi's report, Hartford notified Ms. Dieterich by letter dated November 26, 2008, that it had determined that the evidence submitted in support of her long term disability claim did not meet the policy definition of "disability," inasmuch as she was not precluded from performing one or more of the Essential Duties of [Her] Occupation, and therefore Hartford was terminating her benefits as of November 26, 2008.[49]

Ms. Dieterich's attorney appealed Hartford's decision. By that time Ms. Dieterich had procured her own "independent medical examination" by Dr. William E. Kennedy, an orthopaedic surgeon, and she submitted his lengthy report in support of her request that Hartford reverse its denial. She also submitted the opinion of Dr. Norman Hankins, a Vocational Expert, regarding her functional capacity.[50]

As mentioned above, Dr. Kennedy's report was long, and it was thorough. He reviewed a wealth of reports and other documentation regarding Ms. Dieterich's condition

---

[48]AR. p. 368.

[49]AR. p. 970.

[50]AR. p. 322-336.

from its onset in 2005, and then he conducted his own physical examination of Ms. Dieterich.

He then stated:

> **CONCLUSIONS**: There was satisfactory correlation among the objective findings of record and the ongoing symptoms and losses of physical function described above permitting me to reach the following conclusions with reasonable medical certainty.
>
> Ms. Dieterich has advanced degenerative disk disease of the cervical spine at C-5 with less severe changes at multiple other levels. In particular the changes at C-5 have been clearly demonstrated in multiple MRI studies beginning in 2001 and continuing in November 2003, November 2005, April 2006, and January and December 2008. The most recent of those studies in 2008 showed that the changes at C-5 had advanced sufficiently to cause, myelomalacia of the spinal cord. Multiple MRI studies dating back substantially prior to 2008 also showed foraminal narrowing at C-5 that correlated well with the diagnosis made on multiple occasions dating back at least to 2003 of left C-5-C-6 radiculopathy.
>
> * * *
>
> After taking all of the above findings into consideration, it was my conclusion with reasonable medical certainty that the diagnosis of symptomatic degenerative disk disease of the cervical spine with associated left C-5-C-6 radiculopathy has been well substantiated on an objective basis.
>
> * * *
>
> As a result of the degenerative disk disease of the cervical spine and its accompanying neurological manifestations including the left C-5-C-6 radiculopathy, Ms. Dieterich is permanently limited in her endurance for holding her head in positions away from the comfortable neutral position as in looking forward. She is particularly permanently limited in her ability to tilt her head forward as in looking downward. In addition, she is permanently limited in the fine coordination in her left hand and does not have completely normal sensory function in her left hand to permit normal endurance and fine coordination. Therefore, in summary, she is limited in her ability to use her hands in her previous occupation *as a dental hygienist*, and is permanently limited in her ability to hold her head in the awkward positions required in that type of work for satisfactory visualization of her work. She is also permanently limited

in her ability to work with papers and/or books, and she is permanently limited in her endurance for using a keyboard.[51]

The court noticed that Hartford's brief chose to ignore Dr. Kennedy's references to those objective findings and evidence which tended to substantiate his ultimate conclusions that Ms. Dieterich had relatively severe physical limitations, including the MRI studies, choosing instead to mention only Dr. Kennedy's finding that Ms. Dieterich had normal ranges of motion in all joints in both arms; that her deep tendon reflexes were normal; that she exhibited no signs of localized or lateralized weakness or atrophy in either arm or in the shoulder muscles; that her grip strength followed bell-shaped patterns; and that there was no significant weakness in her legs.[52]

Norman Hankins, the Vocational Expert, relying primarily on the report and findings by Dr. Kennedy, concluded that Ms. Dieterich fully met the definition of "disability" in Hartford's policy.[53] Hartford points out in its brief that Dr. Hankins' reached this conclusion without discussing Ms. Dieterich's actual job duties.[54]   Hartford arranged for Ms. Dieterich to be examined by Dr. Marc Valley on September 4, 2009.  Dr. Valley reviewed plaintiff's records, and Hartford's surveillance video, and then examined plaintiff.[55]  He reported to Hartford that his diagnosis was degenerative disk disease and spondylitic changes at multiple

---

[51]AR. p. 328-0.

[52]Doc. 23, p. 11.

[53]AR. p. 331, 335.

[54]Doc. 23, p. 12.

[55]AR. p. 186-94.

levels in the cervical spine; transverse myelitis; a history of fibromyalgia; and migraines.[56]

Clearly the surveillance video had no small effect on Dr. Valley's impression of Ms. Dieterich: "There is a questionable correlation with the findings on examination verses the findings [sic] of video tape on this patient.  Objectively, the patient has a C-5-6 radiculopathy."[57]  Hartford submitted a list of questions to be answered by Dr. Valley; one of those requested that he "outline in detail [Ms. Dieterich's] functional limitations and impairments."  Dr. Valley responded that Ms. Dieterich is right-hand dominant; that she had left arm cervical radiculopathy; and had transverse myelitis "which significantly impacts her ability to any type of sustained activity such as bending her head forward for a long period of time as required by dental hygienists."[58]  Another question posed to Dr. Valley was, "Given the functional limitations noted on your examination and the medical records, what specific activities would Ms. Dieterich be restricted from performing?"  Dr. Valley responded that he was unable to answer that question, and he recommended that a formal Functional Capacity Evaluation, especially addressing the upper extremities be performed which, in his opinion, was the "only true way to assess the claimant's ability to function under Department of Labor Standard Job Descriptions."[59]

---

[56]AR. p. 192.

[57]Doc. 192.

[58]AR. p. 193.  Once upon a time, Ms. Dieterich was a dental hygienist, but of course she was a Sales Representative at all times relevant to this litigation.

[59]AR. p. 193.

Rather than follow through on Dr. Valley's suggestion regarding a Functional Capacity Evaluation, Hartford submitted plaintiff's file, including the surveillance video, to Dr. John Ayres.  Dr. Ayres, without the benefit of speaking with Ms. Dieterich, much less examining her, concluded that plaintiff had no physical limitations.  Although Dr. Ayres noted in his report to Hartford that he had spoken with Drs. Kennedy and McDavid, he obviously rejected out of hand the opinions that they voiced during their conversations with him.  For example, Dr. McDavid told him that he had known Ms. Dieterich before her problems began; that she was a "high energy" pharmaceutical representative; and that she was a "different person" after her medial problems manifested.  Dr. Kennedy told Dr. Ayres essentially the same thing, adding that the video tape "must have caught her on an unusually good day."[60]

Dr. Ayres ultimately concluded that, "based on [his] conversation with Drs. McDavid and Kennedy, and [his] review of the medical records," he concluded that Ms. Dieterich was limited to lifting, pushing, etc. 50 pounds occasionally and 25 pounds frequently, and 10 pounds constantly. He found no limitations on sitting, standing, or walking.[61]

The standard of judicial review that applies in an ERISA case bears repeating:  The court must use the highly deferential arbitrary and capricious standard, and if the Plan Administrator's decision is rational in light of the Plan's provisions, then the decision was not arbitrary and capricious.  It also bears repeating that this court is not to substitute its

---

[60]AR. p. 202.

[61]AR. p. 205.

judgment of the Administrator merely because the court would have reached a different decision had it tried the issues in the first instance.

This Administrative Record is replete with evidence that would support the decision to award Ms. Dieterich disability benefits. But it also contains evidence that would justify a denial of benefits. To be sure, the latter evidence centers upon the surveillance video; indeed, the physicians who opined that Ms. Dieterich had no significant physical limitations clearly relied in large measure on what they observed in that video recording. But the court cannot summarily dismiss that video recording on the basis that the investigator "caught her on a good day," as Ms. Dieterich argues in her briefs. It was a lengthy recording, and throughout the day, in several stores, she exhibited no physical distress or an inability to move and position herself in any way.

Hartford's decision was neither arbitrary nor capricious; it was rational. It is therefore recommended that Ms. Dieterich's motion for judgment on the Administrative Record, (Doc. 20), be denied, and that Hartford's motion for judgment (Doc. 22) be granted by (1) dismissing Ms. Dieterich's suit, and by (2) awarding judgment to Hartford on its counterclaim for overpayment of disability benefits in the amount of $23,464.79.[62]

Respectfully submitted,


_____ s/ Dennis H. Inman _____

---

[62]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

United States Magistrate Judge